## Case No. 9,875.

### The MOSLEM.

[1 Olcott, 289.]

District Court, S. D. New York. March. 1846.

SHIPPING—LEAKING VESSEL—SEAMEN EMPLOYED TO PUMP—SEAWORTHY CONDITION.

1. If seamen are shipped on a vessel unseaworthy at the time, they may rightfully abandon her or refuse to do duty on board.

2. When seamen know a vessel is leaking three or four inches the hour in port, and came in from sea in a leaky state, and they ship on board mainly to help pump her on her home voyage, they are not absolved from their contract because the leak continues or even increases on the voyage, if she was seaworthy when she left port.

3. Where a ship on a voyage from Manilla to New-York, went into Cape Town leaking, and there received partial repairs, and on survey was pronounced seaworthy, and shipped seamen for the home voyage, but in order to have the advantage of the trade winds, and smoother seas, and sooner to reach a suitable port for repairs, made for Pernambuco, that is not such a deviation as to discharge the seamen from their obligations to her. But if the master intended to take that course when he shipped the crew, or left Cape Town, he was bound to make it known to them.

4. It is no unreasonable service to require a full crew to keep a staunch vessel free of water which does not make exceeding four inches of water the hour; but if at the beginning of the voyage the crew become apprehensive of great danger, it is not disorderly or mutinous conduct for them, in a body, to apply respectfully to the officers, and urge that the ship be put back to port.

5. If, on that application, the master engaged to pay each man one dollar extra per day to continue the voyage, and work the pumps, and promised to sight the island of St. Helena. and to enter the port, if necessary, his failure to run in view of the island was not such a violation of contract as to release the crew from their obligation to the vessel, and justify them in refusing to do duty on board.

6. It was in the sound discretion of the master, in view of the safety of the ship and her company, to go into, or pass the island. Those who for that cause broke off work, and defied the authority of the master, were guilty of mutinous misconduct, and might be coerced back to duty, and also subjected to forfeiture of wages.

7. A punishment by abstraction of wages may be a partial or total withholding of them.
[See note to The Almeida. Case No. 254.]

8. If, on the arrival of the ship at Pernambuco, one of the crew claimed his right to leave the ship, because of her deviation, and refused to do further duty on board for that cause, but was afterwards subdued to the authority of the ship, such disobedience is not cause for the forfeiture of his wages.

9. The subsequent disorderly and mutinous behavior of the seaman, and obstinate refusal during the home voyage to do duty, deprives him of all claim to after wages, but does not retroact and forfeit those earned previous to arrival at Pernambuco.

Peter Scott, filed a libel against the ship Moslem, claiming the wages stipulated in his shipping articles; and also extra wages of one dollar per day on a voyage from the Cape of Good Hope to Pernambuco, and thence to New-York. After the action was commenced and the ship attached, John Rooney, Samuel Phillips and Thomas Channan united in this suit as co-libellants, making like demands of contract and extra wages. The pleadings on both sides are crammed with harsh and criminatory allegations and extraneous statements, by each party against the other. The substance of the charges and issues, which were the subjects of contestation on the trial and entered into the judgment of the court, related, on the part of the libellants, to the deception and misconduct of the master towards the libellants, in hiring them at the Cape of Good Hope, and taking them to sea, and in his unjust and cruel treatment of them on the voyage to Pernambuco; and in respect to Scott, his continued confinement in chains at Pernambuco and during the voyage from that place to New-York; and on the part of the claimants to the disorderly, insubordinate and mutinous conduct of the libellants on shipboard. The rate of wages at which the libellants shipped, and the period they were respectively with the ship, was not in dispute.

The case made by the averments of the libel is, that the libellants were shipped at Cape Town for a direct voyage to New-York. That the ship arrived at Cape Town from Manilla, leaking badly, and continued to leak at the rate of three or four inches the hour, during the period of two or three weeks she remained in that port. That after she put to sea, the leak increased to ten inches the hour. That the libellants, and the rest of the crew, respectfully requested the master to return to port, because of the unseaworthiness of the ship, but he refused to do so, and deviated from his voyage, and ran to Pernambuco. That because of their remonstrances against being forced to remain with the ship in her unseaworthy condition, and against the severe labor imposed upon them at the pumps, the master put them in close confinement on board, and deprived them of necessary food. That he engaged to pay them each one dollar a day extra wages from Cape Town to

Pernambuco, but refuses to pay the same, or any part of their wages. The answer avers that the ship was seaworthy when the libellants shipped, and when she sailed on the voyage. It denies any deviation, and charges that the libellants forfeited their wages by insubordinate and mutinous conduct on the voyage. It is unnecessary to set forth with greater particularity the details of the pleadings. All that are material are comprehended in the issues above stated. Each libellant was examined as a witness for his co-libellants. The main facts which apparently entered into the judgment of the court are gathered from a mass of contradictory allegations, and exceedingly diffuse and rambling statements found in the depositions and oral evidence offered on the trial. They amount substantially to these:

The ship, on her return voyage from the East Indies, put into Cape Town in a leaky state. She lay in port three weeks. Some of her crew left her there. The four libellants shipped there for the home voyage to New-York, making up an extra complement to the ship's company. They knew the ship was in a leaking condition, and shipped with express notice that their services would be mainly required in pumping her on the voyage. The ship leaked two or three inches the hour when she went to sea. After being out about thirty hours, the libellants made known to the master that they were unwilling to proceed on the voyage because the ship was unseaworthy, and requested to be put back to Cape Town. There was nothing disorderly or disrespectful in their proceedings on that occasion. The rest of the crew united in that request. After consultation on board, the ship was put about, and an attempt was fairly made to work her into port. The wind and current being against her, it was found, after twenty-four hours effort, that she made no headway, and the master called all hands and told them he could make St. Helena easier than get back, and would run so as to sight the island, and would put in for repairs if the condition of the ship rendered it necessary; and if the leak did not increase he would make Pernambuco, and there have the ship hove out and fully repaired. To encourage the crew he engaged to give each man one dollar a day extra wages if they would work faithfully on the voyage. The chief work was at the pumps, the ship running free on the trade winds, exacted but slight labor in her navigation. The leak continued without intermission, and required heavy services at the pumps to keep the ship clear. The evidence varied widely between the men and sub-officers as to the degree of leakage and labor; the libellants, in their testimony, represent the leak to have increased to ten inches the hour, which would require, in the estimation of the mate, 4,500 strokes of the pump per hour to keep the ship afloat. He does not estimate the leak to have exceeded four inches the hour at any time,

or to have required more than 750 strokes an hour to clear her. Several ship-masters, experienced in voyages to and from Calcutta, Manilla, &c., testified that they considered the ship seaworthy, manned as she was and running with the trade winds, if she made three or four inches of water the hour, and that 1,000 strokes the hour would be no extraordinary labor at the pumps, as she was manned and provided. The ship, after receiving partial repairs, had been surveyed at Cape Town before going to sea, and pronounced seaworthy. The leak was supposed to have been in her upper works.

The libellants, from the time the ship resumed her voyage, after the fruitless attempt to work back to Cape Town, became reluctant and slack in their work, and disobedient to the officers. Scott was the ring-leader, and was on different occasions insubordinate and insolent to the master, and acted as if determined to shirk all duty. After the ship passed St. Helena, the libellants openly refused to do duty, and went below in defiance of the officers. Scott declared himself an Englishman, and denied the authority of the master over him. They then sung Rule Britannia, in a rude and boisterous manner, and damned the American flag, and refused to come on deck and return to their duty. The master ordered them to be kept in confinement below and on short allowance of provisions for their disobedience and misconduct. They afterwards submitted to the authority of the officers and were again put to duty. When the ship arrived off the roadsteads of Pernambuco, the libellants became turbulent and insubordinate, and assaulted the master; a handspike was raised upon him by one, and Scott seized and held him fast, tearing his clothes. Scott was put in irons for the offence, and was frequently afterwards called upon to return to his duty. The other libellants submitted and went again to their duty. Scott, however, utterly refused to do so, and continuing mutinous and stubbornly insubordinate, was kept under confinement at intervals during the stay at Pernambuco, and then permanently until the arrival of the ship at this port.

The claimants gave direct and positive proof that before the suit was brought the wages of Rooney, Phillips and Channan were paid in full, and their receipt therefor was also given in evidence. Their proctor testified that the master and owners refused to pay any extra wages, and only paid what the captain asserted was the balance due them on the shipping articles, and the libellants denied that the account he made out of their wages was true. He was contradicted in this statement by the person who made the payments.

A. Nash, for libellants, insisted that the master deceived the men as to the condition of the ship when they shipped, overworked them cruelly at the pumps during the voyage,

and had deviated from the voyage for which they shipped; that they had a right to refuse doing duty on board, and to leave the ship the first opportunity, and collect full wages to New-York; that they had not incurred a forfeiture of wages. That Scott was wantonly maltreated and imprisoned at Pernambuco and on the voyage thence to New-York, and that all the men were entitled to one dollar each per day extra wages for the full voyage home. He cited Sherwood v. McIntosh [Case No. 12,778]; Wood v. The Nimrod [Id. 17,959]; Snell v. The Independence [Id. 13,-139]; 9 Johns. 158; 8 Law Rep. 70; Anth. N. P. 32; 1 Hall, 238; The Mentor [Case No. 9,-427]; 1 Hagg. Adm. 182; Id. 59; 3 Esp. 7; U. S. v. Ashton [Case No. 14,470]; Jac. Sea Laws, 142; Butler v. McLellan [Case No. 2,-242]; Curt. Merch. Seam. 296, 299; 2 Hagg. Adm. 243; Moran v. Baudin [Case No. 9,785]; Thomas v. Lane [Id. 13,902]; 14 Johns. 260.

E. Burr, for claimants, contended, on the facts, that the libellants established no right of action.

BETTS, District Judge. It will not be attempted in the examination of the merits of this case, to settle or discuss all the topics brought into the controversy in the multifarious evidence or protracted arguments of the parties. Four or five entire days have been exhausted on the hearing. The testimony upon various points in dispute cannot be reconciled, and the judgment of the court has not unfrequently been governed more by the strong probabilities surrounding the case, than the positive assertions of witnesses.

In respect to the condition of the ship when the libellants entered upon the voyage, I deem it less important to determine whether she was fully seaworthy than to ascertain the fairness of the dealing of the master with them. They were English seamen ashore, out of employment, and seeking an opportunity to leave the Cape. The ship lay about three weeks in the port undergoing repairs, and they had full opportunity to inform themselves of her state, so far as that could be known from external appearances and the degree of leakage, because, not only was her condition a fact of notoriety, but they were in intercourse with some of her crew who had left her at that port, and were themselves frequently about her, and, as it would appear, also on board her at her berth. The master explained her situation to them when they were hired, and engaged them expressly to aid in working the pumps, assuring them their general work in navigating her would be light, as he had shipped extra hands.

My attention has been carefully directed to this particular, as from the general heedlessness of sailors they are exposed to be drawn into improvident bargains; and these men, in a degree destitute, in that remote part of the world, where the opportunity to select their employment must be rare, would be eminently liable to imposition or disadvantageous engagements. But, looking watchfully at the whole evidence to this point, I am satisfied the libellants entered into this agreement with a plain understanding of its character and probable hazards, and that the officers of the ship practiced no deceit or improper influences with them in making the shipping contract. Still, if the ship was actually unseaworthy at the time, or proved to be so when she entered upon the voyage, the libellants were not bound by their contract, and could rightfully refuse to continue the voyage and compel the master to return with the ship to port. Porter v. Andrews, 9 Johns. 350; U. S. v. Ashton [Case No. 14,470]. The conduct of the libellants in requesting the master the first day out to go back to the port of departure, because of the leaking of the ship, was respectful and proper, and if not obeyed, provided the ship was unseaworthy, would have dissolved their obligation to remain with her and incur the hazard of a voyage on board. The master most properly submitted to their demand, and I think satisfactorily proves, he attempted in good faith to comply with it. His judgment, that greater danger was incurred by beating back against wind and current in her then state than by continuing his course upon the trade winds, is confirmed and justified by the judgment of several experienced shipmasters who were examined to that point on the trial. This was clearly explained to the crew at the time, and all hands went freely to their duty and put the ship upon her course. After this the libellants were bound to obey the orders of the master, and lend their services faithfully in the work of the ship.

I do not consider the statement of the master to the crew that he would run in sight of the island of St. Helena as a positive engagement to make that direction part of the route, so that a departure from it would constitute a deviation. The marine laws are peremptory that the master shall perform the voyage stipulated in the shipping contract, and holds the seamen discharged of their obligation to the ship if he deviates from it. Curt. Rights Seam. 25. But this duty respects the voyage, its inception, and its specified termini, and has no relation to the track or line of navigation pursued in accomplishing it. That must, from its nature, be contingent, or regulated at the sound discretion of the master. Had the libellants proved an express agreement of the master to run in sight of St. Helena, it would be no deviation, in a maritime sense, to have varied his route so as to fail of a literal fulfilment of such engagement. To keep intentionally away from the island would be a breach of the terms of such engagement, but it would be damnum absque injuria, if no necessity existed for resorting to that port. Of that necessity the master, from his position, must be judge, and if he acts in good faith and fairly upon the facts before him, his decision

should be final. He considered the vessel capable of making Pernambuco, that she was under no exigency to seek St. Helena, and that there was no object in stopping there except to save the crew from imminent peril to their lives, as the ship could not obtain repairs at that port, and the interests and safety of the ship and crew required him to pursue the most direct course to Pernambuco. This conclusion is fully supported by the evidence in the case.

Nor under the facts can the claim of the libellants prevail, that they were absolved from all obligation of obedience and duty to the vessel because she was put upon the course to Pernambuco, and not directly to New-York. Ordinarily, the shipping contract is to be understood as contemplating a direct voyage from the port of departure to that of its termination, unless a different course is stipulated in the agreement, or is plainly made known to the seamen. The Minerva, 1 Hagg. Adm. 347; The George Home, Id. 372. But in this instance, after the ship left port, a departure from the shortest line to her port of destination would be justifiable on the fact that Pernambuco was the nearest accessible port at which the repairs needed could be obtained; and also because it was the surest and speediest route in the condition of the ship. A change of voyage which may discharge mariners from the obligation of their contract, must be wilfully made by the master, and enforced against their consent or acquiescence. Wood v. The Nimrod [Case No. 17,959]. This is a common course of navigation with vessels bound from the Cape to the United States, and might reasonably be implied as so understood by the libellants, as they were in the port, waiting and seeking the opportunity of a return to this country. They made no opposition or objection to this course of the voyage, when it was declared to them and was resumed, and the promise of extra pay had been given them. They grumbled afterwards, and were insolent and occasionally insubordinate, but their complaints were against the state of the ship and the labor exacted of them, and not to the course run, until they were carried past St. Helena. Then it was they refused to perform further duty on board unless the ship was taken back to the island, and persisted in the refusal until coerced by close confinement and privation of food to yield and return to their services.

These facts, I think, afford a satisfactory presumption, that if the master intended going to Pernambuco when the libellants were hired, they were apprised of it, or that if that route was fixed upon after getting to sea, they either acquiesced in it, or the change was one of probable necessity, and thus excusable in the master. Under either circumstance, the libellants were bound to a full obedience and faithful discharge of their contract, and their misconduct on that occasion, in my opinion, justly authorizes the owners

of the ship to resist the demand for wages, and have, at least, judgment of forfeiture of the extra pay, being a proportion of the libellants' wages. The court is not compelled to pronounce a forfeiture of the entire wages, but may punish malfeasances or dereliction of duty at sea by such abstraction of wages or mulcts as will, in its judgment, supply an appropriate punishment. The Baltic Merchant, Edw. Adm. 86; The Lima, 3 Hagg. Adm. 359; Cloutman v. Tunison [Case No. 2,907]; Poth. Mar. Cont. art. 178; The Elizabeth Frith [Case No. 4,361].

The after submission of the men to the authority of the ship, and return to duty, with the acquiescence of the master, and their continuing to serve on board until her arrival at Pernambuco, should operate in equity to preserve the wages agreed in the shipping articles. I do not hold the transaction an entire condonation of their offence, yet I do not think the master should be allowed to inflict corporal punishment sufficient to bring the men back to duty, avail himself of their services, and then exact a confiscation of their whole wages for conduct, although highly disorderly and mutinous, yet based upon colorable grounds of wrong towards them, and of right on their part to hold themselves discharged of all obligation to the ship.

The point taken on the defence, that the engagement of the master to give the crew extra pay was obtained from him by duress, or unlawful compulsion, is not tenable. It was proposed spontaneously by himself, and in the exigencies of the ship and all her company, was reasonable and proper in itself, and would be upheld in favor of these men, had they not sacrificed their rights by their own after misconduct.

It is further insisted, that this claim was satisfied by the master after the termination of the voyage at this port, and was included in a receipt in full, taken by him on settlement with all the men except Scott. The testimony of the libellants' proctor, and a clerk of the claimants' proctor, in respect to that settlement, stands in direct conflict. Without deciding the question of credit between those witnesses, and independent of the other special grounds of defence, I shall place the denial of extra wages to these men, exclusively upon the right of the owners to their forfeiture. The proof is ample that their contract wages were fully paid, and that they became parties to this action solely to recover their extra pay.

It is therefore ordered, that the libel be dismissed in respect to Rooney, Phillips and Channan.

Although Scott had been the ringleader in the disturbances and mutinous conduct at sea on the passage from Cape Town to Pernambuco, yet I regard his restoration to duty by the master, on his confession of his faults and promise of good behavior, a remittance of the absolute forfeiture of wages he had incurred, and I shall not accordingly discriminate

between his case and that of his fellows up to the arrival of the ship at Pernambuco roads.

The statements in the proofs of the transactions at Pernambuco in respect to Scott are entangled and equivocal, and lack that fullness and certainty which might enable the court to determine satisfactorily the true character and extent of his offences at that place. He was at times disorderly and dangerous, and was punished severely therefor, on shipboard and on shore, and it would appear that the master considered these punishments adequate and sufficient for the offences, as he offered to receive him back to his place in the ship. The other men involved with him in the misconduct accepted the pardon, and performed duty up to the arrival of the ship in New-York, and were there paid their wages in full. Scott maintained an unflinching refusal to submit, declaring he had been kept so long in irons he would remain in that condition to New-York, and be judged there, and he was accordingly confined in irons on board during the voyage home.

Scott addressed a letter to the master at Pernambuco, manifesting penitence and humble submission to his authority, promising to refrain from liquor and behave well thereafter. It is not clearly shown why that repentance was not accepted by the master, and it has not been made to appear distinctly that the letter was not written during his last confinement at that port, although much rambling and incoherent evidence was given tending to show that the letter was written long before the ship left the port, and that the conduct of Scott was constantly violent and refractory until her departure.

Scott insisted he was entitled to a discharge at Pernambuco, and that the master had no rightful authority over him there; and so far as he may be regarded acting under an honest belief in that right, his refusal to yield to the commands of the officers of the ship should be considered leniently, and his first offer to return to duty should have been accepted. The proofs, however, tend strongly to the conclusion that this submission was in fact offered and accepted on his first imprisonment, and that he immediately afterwards renewed his disorderly and mutinous conduct, and was imprisoned therefor on shore and in the ship. After he was brought back to the vessel, in irons, and on the homeward voyage, he was repeatedly urged by the master to return to his duty, but he peremptorily refused to do so. This conduct necessarily bars his demand for wages from Pernambuco to New-York.

Desiring to look as favorably as the testimony will admit at extenuating circumstances on the part of seamen, when a total forfeiture of wages already earned is sought for, I hold that the master has not given sufficient proofs to make the misconduct of Scott at Pernambuco, and from thence to New-York, forfeit his antecedent wages, and shall, ac-

cordingly, decree in his favor for the balance of wages due and unpaid, on the arrival of the ship at Pernambuco. I cannot collect from the proofs the true state of his accounts with the ship at the time he was imprisoned at Pernambuco, and, unless the parties agree upon the amount, it must be referred to a commissioner, to ascertain the sum then due him, deducting all payments made him.

The final decree will include all proper directions in respect to the details of the judgment and costs.

[The commissioner reported $15.42 as due to Scott. Exceptions were taken. The report was confirmed, but without costs to the libellant. Case No. 9,876.]