## THE GRACE DOLLAR.

(Circuit Court of Appeals, Ninth Circuit. February 3, 1908.)

No. 1,461.

SEAMEN—RIGHT TO WAGES—DESERTION—CONSTRUCTION OF SHIPPING ARTICLES.

Libelants signed shipping articles for a voyage "from the port of San Francisco, Cal., to Portland, Or., and other Columbia river ports, and return to San Francisco for final discharge, either direct, or via one or more ports on the Pacific coast, north or south of the port of discharge, as the master may direct, voyage not to exceed six calendar months." The vessel proceeded to Portland, where she took on a cargo of lumber for Los Angeles, and after its discharge proceeded north, past San Francisco, to Gray's Harbor for another cargo of lumber for San Francisco. *Held*, that she did not deviate from the stipulated voyage, and that, in leaving the vessel at Gray's Harbor against the master's protest and after having served only 26 days, libelants were deserters and forfeited their right to wages.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Seamen, §§ 104, 106.]

Appeal from the District Court of the United States for the Western Division of the Western District of Washington.

For opinion below, see 149 Fed. 793.

Marquis & Shields and H. W. Hutton, for appellants.

Nathan H. Frank and Walter D. Mansfield, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

GILBERT, Circuit Judge. The appeal in this case is from a decree of the District Court in which the libel of the appellants to recover wages as seamen was dismissed on the ground that the wages were forfeited by an abandonment of the voyage before its conclusion. On or about May 10, 1906, the appellants shipped for a voyage on the steamer Grace Dollar. Seven of them signed as able seamen, three as firemen, one as cook, one as waiter, and one as second mate. The shipping articles described the voyage as follows:

"From the port of San Francisco, Cal., to Portland, Or., and other Columbia river ports, and return to San Francisco for final discharge, either direct or via one or more ports on the Pacific coast, north or south of the port of discharge, as the master may direct; voyage not to exceed six calendar months."

On or about May 11, 1906, the vessel, with her master and crew, went from San Francisco to Portland, where she took on board a load of lumber. Thence she proceeded southward to Los Angeles. There the cargo was discharged. Thence she went northward, past the port of San Francisco, to Aberdeen, in Gray's Harbor, in the state of Washington, arriving there on June 5, 1906. At that port the seven sailors claimed that their contract had been completed, and they went ashore after the master had informed them that, if they did so, they would be considered deserters. Later in the same day, on the instructions of an agent of the Sailors' Union, the three firemen, the cook, and the waiter quit the vessel, and on the following day the second mate did likewise. The master refused to pay any of said crew their earned and unpaid wages, on the ground that they had deserted the ship without just or reasonable cause before their term of service had expired, or the voyage for which they had signed had been completed.

The sole question involved is whether or not there was such deviation from the voyage as to justify the libelants in abandoning the ship. The statute requires that the shipping articles set forth "the nature and so far as practicable the duration of the intended voyage or engagement, and the port or country at which the voyage is to terminate." This is one of the many provisions that have been enacted for the protection of seamen, who are regarded as the wards of the nation. Its object is to prevent the entrapping of seamen into a voyage of greater length or of more peril or labor than that which they have assented to and for which they ought to receive increased wages. Such a statute should receive a reasonable construction. Obviously, it is important that the mariner shall be informed in a general way of the general course of the voyage, but the essential requisites of the statute are that he shall know the duration of the voyage and the port of his final discharge. The Mermaid, 115 Fed. 13, 52 C. C. A. 607. It is not always feasible to name, at the outset of a voyage, all the ports to which the demands of trade may carry the vessel, and it is not necessary that the seamen be advised of all the operations of the voyage, and especially is this true of a coastwise voyage. To hold otherwise would be to impose burdensome and destructive restrictions on commerce without conferring any substantial benefit on seamen. British legislation on this subject has been influenced by the same protective policy as our own. The English merchant shipping act of 1854 (section 149) provided that the shipping articles should, among other things, set forth "the nature and, so far as practicable, the duration of the intended voyage or engagement." But in 1873 the section was so amended that the agreement, instead of stating the nature and duration of the intended voyage or engagement, may "state the maximum period of the voyage or engagement, and the places or ports of the world (if any) to which the voyage or engagement is not to extend." In The Moslem, Olc. 289, Fed. Cas. No. 9,875, it was said:

"A change of voyage which may discharge mariners from the obligation of their contract must be willfully made by the master and enforced against their consent or acquiescence."

By the shipping articles in the present case the crew consented that, after loading at Portland, the vessel might go to other ports on the Pacific Coast, either north or south of San Francisco, or both, within the prescribed six months, as the master might direct. The vessel was engaged in the lumber trade. The ports of supply were north of San Francisco, and the markets were at San Francisco, or at ports south thereof. The vessel, having loaded at Portland, sailed to Los Angeles and discharged her cargo there. It had not yet touched at a port north of San Francisco, and it proceeded north to obtain another cargo for the purpose of carrying the same to San Francisco, the port of final discharge. We think that this was within the intendment of the articles and that there was no deviation. At the time when the appellants left the vessel, they had served but 26 days of the 6 months specified in the articles. There is nothing in the record to show that on leaving Los Angeles they demanded to be taken to San Francisco, or that they made any objection or protest against going to Gray's Harbor for a cargo. Their first objection appears to have been made after the vessel had been made fast to the wharf at Aberdeen. All that then remained to be performed of the voyage was to load a cargo of lumber and take the same to San Francisco, a service that could not have occupied more than 10 days.

In Magee et al. v. The Moss, Gilp. 219, Fed. Cas. No. 8,944, the voyage described was from Philadelphia to South America, or any other port or ports, backwards and forwards, when and where required, and back to Philadelphia, unless sooner discharged. The ship went to Buenos Ayres, thence to Havana, thence to Marseilles, thence again to a port in South America, and returned to Philadelphia. The court, in holding that a desertion of seamen at the port of Havana was not justifiable, said:

"It will not do to tie down these contracts, made sometimes in a counting house, and sometimes in the cabin of a ship, to the strict rules of composition. We must endeavor to come at the true meaning of the parties and to give the contract a reasonable construction; to take care to put upon general words a just and reasonable limitation, but not lightly to destroy and avoid the whole contract, because the generality or breadth of the expressions may be in a degree uncertain or might be used to impose an oppressive service. * * * In the present case I can see nothing unreasonable or oppressive in the construction the captain has put upon these articles."

Of similar import is the decision of the same court in Wood et al. v. The Nimrod, Gilp. 83 Fed. Cas. No. 17,959, in which the voyage was described as from the port of New York to Darien, thence to St. Thomas, thence to New Orleans, or as the master may direct, and back to New York, her port of discharge. The vessel sailed from New York to Darien, thence to St. Thomas, thence to Maricaibo, and from there sailed for Philadelphia not going at all to New Orleans. At Philadelphia the seamen deserted. It was held that thereby they forfeited their wages.

The case of The J. M. Griffith (D. C.) 71 Fed. 317, cited by the appellants, involved the construction of shipping articles different from those which are here presented. In that case, the voyage was to be

"from the port of San Francisco to Port Hadlock, and thence to San Francisco for final discharge, either direct or via one or more ports of the Pacific coast." There was no express provision for touching at a port south of San Francisco, and there was ground for holding that San Pedro, which lies several hundred miles south of San Francisco, was not a port which could be said to be by way of the route from Port Hadlock, Wash., to San Francisco. In Rury v. McKay (D. C.) 84 Fed. 360, and The Laura Madsen (D. C.) 84 Fed. 362, the courts, we think, went further than authority and sound reason warrant, and we are unable to agree with the conclusions which they reached.

The decree is affirmed.